In the Matter of the Accounting of Syracuse Trust Company, as Trustee under the Will of Frank E. Wade, Deceased, Respondent.

Margaret S. Wade et al., Appellants.

Fourth Department, March 20, 1946.

*James N. Vaughan* for Margaret S. Wade, appellant.

*Raymond O. Campbell,* special guardian for Michael Wade and others, appellant.

*Francis P. Maloney* for respondent.

LARKIN, J.   The testator, Frank E. Wade, died a resident of the city of Syracuse, March 3, 1930, leaving a will of January 5, 1928, admitted to probate April 7, 1930.   The testator appointed his widow, Margaret S. Wade, and the Syracuse Trust Company, executors, and the trust company as trustee of the trusts created by the will.   Both qualified, Mrs. Wade as executrix and the trust company as executor and trustee. Letters testamentary were issued to them on April 7, 1930. The distributees of Wade, had he died intestate, would have been his widow and three children, William Wade, Anna Wade

and Margaret Wade. The ages of the children do not appear. Neither does it appear whether, at the time of testator's death on March 3, 1930, the children were married. The record discloses that in 1935, the two daughters were married and each had children. At that time all of the children were apparently of full age.

Decedent's will consists of thirteen separate and distinct paragraphs. In the first he directs the payment of his debts. In the second he makes a specific devise and bequest to his widow of the family residence, together with the household furniture, automobiles and personal effects. In the third he makes four bequests to different individuals, aggregating $13,000. In the fourth, fifth and sixth he sets up three spendthrift trusts, two of $40,000 and one of $50,000, for the benefit of relatives with the corpus eventually finding its way into the hands of his children or their issue. The seventh paragraph creates a trust of $500,000 for his widow. The trustee is directed to invest and reinvest in securities legal for investments by trustees and pay the income in quarterly installments to his widow during her lifetime. At her death, the corpus becomes a part of the residuary estate to be added in equal shares to the three trusts created by the eighth paragraph for his children. In the eighth paragraph, the testator gives to his trustee, all the remainder of his property, directing that it be set up in three equal trusts for his three children, William, Anna and Margaret He directed his trustee to invest same and pay over to each child the income during the child's life. The trust for his son, William, is rather significant, for the testator authorizes William at the age of twenty-five to withdraw from the corpus one third of it, with a similar right as to another one third when he reaches the age of thirty. At thirty-five, William is entitled to have delivered to him the remainder of the principal in excess of the sum of $100,000, which amount the trustee was directed to hold in trust for William's benefit during his life. In the event that William dies before or after attaining the age of thirty-five, he is given the power of appointment by will. In the event that he dies intestate, the principal then remaining in the hands of the trustee passes to William's descendants. The trusts of equal amounts created for testator's two daughters give to each daughter a power of appointment as to $100,000, but the balance passes to the daughter's descendants. If she dies without descendants, then her share goes to the testator's other two children or their descendants. In the ninth paragraph of the will the testator forbids the alienation

of any part of income by any beneficiary and provides that neither principal nor income is subject to attachment or other legal proceeding in the hands of the trustee, except to the extent permitted by the laws of New York. The tenth paragraph of the will is, again, a significant one, especially as it applies to this litigation. The testator directs that any stocks, bonds or other securities belonging to him at the time of his death may be turned over by his executors to his trustee in the erections of the trusts *herein created,* and grants to the trustee full authority, in its absolute and uncontrolled discretion, to hold and retain any of the property going into its hands thereunder in the same form as that in which it was received, even though it may not be of the character of investments permitted by law for trustees. Since the tenth paragraph creates no trust, it is evident that the words " herein created " refer to all of the trusts created by the will. The eleventh, twelfth and thirteenth paragraphs it is unnecessary to note insofar as this litigation is concerned.

Following the issuance of letters testamentary, an inventory of the personal estate was made. It disclosed one valued at $1,818,573.77. This inventory is not printed as part of the record. Neither does the record disclose any information from which a finding can be made as to what Wade was worth on January 5, 1928, at the time he made his will. However, since it is a matter of common knowledge that through the years 1928 and 1929, values of securities were rising and in late October, 1929, values declined in one of the sharpest breaks the security markets of this country have ever known and that such decline was manifest through the balance of 1929 and until about the time of Wade's death, it is fair to assume that when he made his will, his estate was approximately of the same value as when inventoried two years later. That particular feature, although there is no direct testimony upon which to make such a finding, is quite important as bearing upon the amount the testator intended, at the time he made his will, to be the value of each of the three trusts set up for his children. His intention to create for each child a trust of at least $300,000 seems apparent.

Following the inventory, the executors apparently proceeded with expedition, paying the legacies mentioned in the third paragraph, the debts and death taxes, and setting up the three small trusts created by the fourth, fifth and sixth paragraphs. From the summary of the account of the executors as filed with the Surrogate in 1935, 1936 and 1937, it seems fairly evident

that after the payment of the foregoing amounts and setting up of the first three trusts, in the personal estate, assuming that at that time there had been no serious losses or shrinkage in value, there still remained assets aggregating approximately $1,400,000.

Although, as far as this record discloses, there was no obstacle which would have then prevented the closing of the estate and the setting up of the four trusts for the widow and the children, at least at the expiration of a year from the date of Wade's death, this was not done. On the contrary, the executors continued to hold the estate, receiving the income and seemingly disbursing it, since the amount of income which they received, as shown by their final account, covering the period from April 7, 1930, to January 5, 1937, was $317,939.24, and, as they take credit for payment made from such income, of $313,937.32, it is fair to assume that this was income, in great part at least, from securities belonging to the testator which then remained in their hands. Since there was no one else entitled to receive this income, other than the widow and her three children, again it is fair to assume that this income was disbursed to them, although in just what amounts is not disclosed by the present record, but undoubtedly was shown in the accounts filed with the Surrogate.

In 1935, the trust company, as one of the executors, filed an account for both executors covering their proceedings as such executors from April 7, 1930, to the 30th day of June, 1935. All persons interested in the estate were cited and served, except those who waived service, who were the widow, Margaret S. Wade, individually, William Knabe and the trust company as trustee of the three trusts created by the fourth, fifth and sixth paragraphs of the will. Special guardians were appointed for the children of the two daughters of the testator. Objections, the nature of which is not shown by the record, were then filed to this account by the two special guardians; by lawyers representing persons interested in the three small trusts; by the daughter, Anna Wade Green; by the son, William Wade, and by the widow, Margaret S. Wade. Apparently the proceeding remained dormant until the 28th of October, 1936, when a supplemental account of the proceedings of the executors from April 7, 1930, to the 7th of October, 1936, was filed. Thereafter, a second supplemental account was filed by both executors on January 14, 1937, covering their actions as executors from the 7th of April, 1930, to the 5th of January, 1937.

During the period between the first hearing, September 16,

1935, and until January, 1937, the parties and their attorneys evidently negotiated for the purpose of settling the disputes which had arisen. Early in December, 1936, they arrived at a basis of settlement. The terms of this settlement were:

1. The widow agreed to restore to the estate executor's fees which seemingly had been paid to her before they had been allowed. With those fees additional legals were to be purchased to give to her trust a then market value of $400,000, which she was to accept in lieu of the amount, $500,000, specified in the will.

2. Provision was made for the filing of a supplemental account so that the executors could be discharged.

3. All objections to the accounting were to be withdrawn and the items in all accounts of the executors were approved by all the interested parties including the special guardians.

4. No executors' fees were to be asked or accepted by either executor.

5. The trusts for the widow and her three children were to be set up from the securities on hand and all the interested parties, including the special guardians, stipulated that the trustee might continue to hold the securities in their then form without incurring any liability for future losses or depreciation.

6. The bank agreed to accept the trust and continue to act as trustee without fee.

7. The three children and the special guardians stipulated that they approved all past action of the bank, as trustee of the trusts created by the third, fourth and fifth paragraphs of the will, and that the trustee might file an intermediate accounting to which they would file no objections.

8. All the parties agreed that while they recognized the right of the trustee to resign at any time in the future with the approval of the Surrogate and the right of the beneficiaries to ask for an appointment of a substituted trustee, still it was stated and understood that the trustee then had no intention of resigning.

This agreement was approved by Mrs. Wade's attorney, by the attorney for the two children who had filed objections, Anna Wade Green and William Wade, and by the attorneys for the other daughter, Margaret Wade Bond. It was also approved by both the special guardians.

Thereafter a more formal agreement, embodying the foregoing terms of settlement, was executed January 7, 1937, and filed with the Surrogate. This agreement was signed by the trust company, the widow individually and as executrix, the three adult children, the two special guardians, and by the

attorneys for those interested in the three trusts created by the third, fourth and fifth paragraphs of the will. Pursuant to this agreement, the *two executors* filed the second supplemental account of their proceedings from April 7, 1930, to January 5, 1937. Thereafter the matter came on before the Surrogate, who, by a decree dated January 14, 1937, approved the settlement and settled and approved the accounts of the executors in accordance with the accounts filed with him. The decree recited that there was in the hands of the executors for distribution, in accordance with the terms of the testator's will, cash and property in the amount of $965,053.85 and that the executors had allocated and set aside securities and moneys for the purpose of establishing the trusts created by the seventh paragraphs of the will and ordered and adjudged that the executors turn over to the trust company, as trustee under the trust created by the seventh paragraph of the will, for the benefit of the widow, certain securities therein set forth which, at their *then value,* together with $2,130 in cash, amounted to the sum of $400,000. The decree further provided that the same should be paid by the executors and received by the trustee in full payment by the executors to the trustee of the principal of the trust created by the seventh paragraph of testator's will, and in full discharge of the obligations of the executors under that paragraph. Similar directions were made in the decree, that the executors turn over to the trustee certain specified securities, at their then specified value, for each of the three trusts created by the eighth paragraph of the will for the benefit of the three children. The value of the securities which went into each of these trusts was $177,017.31. A further provision of this decree directed that the executors, having in their hands accumulations of income amounting to $4,001.92, of which $1,697.52 represented income from the securities set aside as principal of the trust created for the widow and the balance as income from the securities set aside for the trusts of the three children, pay these amounts directly to the four beneficiaries.

Apparently from that time until March 31, 1942, the trustee performed its trust duties, paying over to the beneficiaries the income from the securities in each which had been allocated to each trust by the Surrogate's decree of January 14, 1937. On March 31, 1942, the trustee filed a petition with the Surrogate seeking an intermediate accounting of the widow's trust. On the return day of the citation, a special guardian was appointed for the testator's grandchildren. The widow was,

of course, a party to the proceeding. She and the special guardian filed objections to the trustee's account. These objections may be summarized as follows: By the first and second it was sought to surcharge the trustee with $100,000 with 6% interest from January 14, 1937, the date of the decree settling the accounts of the executors. The basic theory of these two objections is that the decree, insofar as it reduced the corpus of Mrs. Wade's trust from $500,000 to $400,000, was void, in contravention of section 15 of the Personal Property Law and section 103 of the Real Property Law. By the other objections a surcharge was sought for losses claimed to have resulted from breach of duty by the trustee in placing in the trusts securities not legal investments for trustees.

The referee heard the parties, taking testimony oral and written. He reported for disallowance of the objections. As to the first two he determined that by the *cestui's* consent and acquiescence in the decree of January 14, 1937, she was estopped to question it, not only on that basis but also because of her laches in waiting five years, and accepting the benefits therefrom, before doing so. Additionally, he determined that what she did amounted to a disclaimer of the trust to the extent of $100,000.

Finding no negligence on the part of the trustee, and determining that the investments questioned were legal ones for trustees, he disallowed the remaining objections.

The surrogate confirmed this report, and settled the trustee's account in accordance with the account as filed. He allowed $5,000 to the referee chargeable to income and $2,500 to the special guardian chargeable to the corpus.

From that decree, the *cestui* and the special guardian appealed to this court. On this appeal both appellants present the same objections heard by the referee. In addition, the *cestui* questions the propriety of the allowances, but the special guardian does not.

The most troublesome question presented is found in the first two objections, which both stem from the fact that by the decree of the Surrogate made January 14, 1937, securities of the, then, value of $400,000 were allocated to Mrs. Wade's trust in fulfillment of the provision of the seventh paragraph of testator's will which created a trust fund for her of $500,000. In considering this question, one must start knowing that by section 15 of the Personal Property Law the right of a beneficiary to enforce the performance of a trust to receive the income of personal property and to apply it to the use of any person, cannot be

alienated, and that section 103 of the Real Property Law contains a similar provision in reference to trusts of real estate.

It may be conceded that if by the decree of January 14, 1937, the widow's trust was *actually* reduced from $500,000 to $400,000, such reduction contravened the statute, rendering it ineffectual to foreclose the *cestui*, in the instant proceeding, from surcharging the trustee with the reduction and possibly, too, with legal interest from January 14, 1937. A reduction, purely as such, would be indirectly an alienation of income. The public policy as declared by the decisions of our courts, renders a decree based on a destruction, in whole or in part, of a spendthrift trust void.

Nor can such a destruction ordinarily be justified upon an estoppel arising from the *cestui's* consent or acquiescence. The authorities cited by appellants seem fully to sustain their contention as to that. Some of these decisions are *Douglas* v. *Cruger* (80 N. Y. 15); *Lent* v. *Howard* (89 N. Y. 169); *Cuthbert* v. *Chauvet* (136 N. Y. 326); *Matter of Wentworth* (190 App. Div. 829, affd. 230 N. Y. 176) and literally a myriad of decisions of the various surrogates of the State, in whose court the question usually arises.

But the respondent urges, as the referee herein determined, that in making the decree of January 14, 1937, the surrogate was entitled to treat this *cestui's* acts as amounting to a partial renunciation of the trust. Again this basis for the decree seems frail. In the first place, there may be doubt as to the right of a *cestui* to disclaim partially, conceding a right to disclaim *in toto*. Assuming, however, such a right, it could not justify the decree insofar as it placed the disclaimed portion in the other trusts for that would be an acceleration of the remainder against the will. (*Matter of Hanna*, 155 Misc. 833.) All that such a disclaimer could authorize would have been the payment of the income from the disclaimed portion to the three children as the ones entitled to the next estate. Moreover, even if the view of the author as expressed in Scott on Trusts (Vol. 3, § 337.7) be adopted, that a spendthrift beneficiary can, before acceptance of benefits under the trust, renounce, and even if such a rule applies to a partial renunciation, this record seems to show clearly that the beneficiary accepted benefits under the trust provision for her in the seventh paragraph of the will. The acceptance of such benefits, by receiving portions of income collected from 1930 to 1937, has already been noted. Therefore it seems to follow that on the theory of partial renunciation the decree of January 14, 1937, cannot be sustained.

However, it does not follow that because the decree of January 14, 1937, cannot be upheld upon the theory of a pure estoppel or à partial disclaimer it is not conclusive herein, foreclosing the *cestui* from surcharging this trustee with the sum of $100,000, with 6% interest. At the outset, it must be kept in mind that this decree was a final judgment of a court of record from which no appeal was ever taken by any of the parties which it purported to bind. While one may agree with the appellants that the rule of this State in reference to spendthrift trusts, as a matter of public policy, is that they cannot be destroyed by the consent of trustee and the *cestui* nor by the judgment of a court in making such a decree based upon their consent, still that rule is no more sacrosanct than the rule which has always prevailed, that a judgment of a court of record is never presumed to be void or erroneous but on the contrary, the presumption is that the court acted justly, after due consideration and for good reason, in accordance with its duty. Moreover, here there is no direct attack upon this decree by the widow. She does not seek to set it aside and relegate the parties to it to their original position. She does not even ask to recapture from her children's trusts, securities of the value of $100,000 which are now in the possession of this same trustee, and which she now claims were improperly allocated to those trusts. On the contrary, what she is doing herein is to make a collateral attack upon the decree of January 14, 1937, and to surcharge her trustee, personally, with the claimed loss. The presumption as to the validity and conclusiveness of a judgment of a court of competent jurisdiction is especially applicable when collaterally attacked. The rule of the binding force of judgments is well stated in *Herring v. N. Y., L. E. & W. R. R. Co.* (105 N. Y. 340, 371–372). " The adjudications made in .the foreclosure action absolutely bound all the parties thereto, and none of them could thereafter be heard to say that they were not founded upon sufficient evidence. The Supreme Court having general jurisdiction of the parties and the subject matter is conclusively presumed to have had sufficient facts before it to authorize the judgment and the orders which were made, and neither the Erie Company nor any of its general creditors can now be heard to say that the judgment was not pronounced after full examination and investigation of all the facts upon which it was based. It imports absolute verity, and it must be presumed that these stocks and bonds were properly subject to the mortgages and were properly sold in connection with and as a part of the mortgaged property. (*Grignon's*

*Lessee* v. *Astor,* 2 How. [U. S.] 319.) Where a court having jurisdiction of the subject matter and the parties pronounces judgment upon insufficient or illegal evidence, or mistakes the evidence or the law, the only remedy of any person aggrieved by the judgment is by an appeal therefrom or a motion in the action in which it was rendered; but it cannot be assailed collaterally.'' What was said in the opinion in *Crouse* v. *McVickar* (207 N. Y. 213, 217–219) applies particularly to the present situation. A similar holding may be found in *Canfield* v. *Harris & Co.* (252 N. Y. 502, 504–505.) Cf. *O'Donoghue* v. *Boies,* 159 N. Y. 87 and *O'Donaghue* v. *Smith,* 184 N. Y. 365.)

The foregoing statements in reference to the presumption of the validity of the final judgment are fully applicable to this decree of the Surrogate of January 14, 1937. Concededly, he had general jurisdiction and particular jurisdiction of the accounting of these executors. He acquired jurisdiction of the parties by service or waiver of citation. The living grandchildren were represented by special guardians. Even unborn children were represented by the living persons, through whom they would take. (*Kent* v. *Church of St. Michael,* 136 N. Y. 10.) Moreover, under section 40 of the Surrogate's Court Act, on this accounting, the Surrogate had equitable power.

While it may be conceded that in effect he approved a prior settlement of the parties, it does not follow that the decree which he made, which in substance followed that, was a ministerial act. On the contrary, it must be deemed to have been a judicial one. The surrogate was not required to approve the settlement. In making the decree, insofar as it may be said to have done so, it must be held that he approved the compromise, taking into consideration all matters of which it can be said he was properly cognizant. He had before him the inventory of the estate and the detailed account of the proceedings of the executors. It is presumed that he made this decree after investigation and having satisfied himself that the decree was a proper one.

Since, in the instant proceeding, the objectors were confronted with this decree of January 14, 1937, which if it were valid foreclosed them from obtaining a surcharge on the basis of their first two objections, and since there was a presumption of validity in favor of the decree, it was incumbent upon them to establish in some manner that this decree of January 14, 1937, was void insofar as it partially destroyed a spendthrift trust, as claimed by them. To establish that invalidity they relied upon the seventh paragraph of the testator's will which

set up a trust of $500,000, the fact that the compromise agreement provided literally *for a reduction* of this trust from $500,000 to $400,000, the decree itself, the language of which again refers to the act as a *reduction* of the trust, and the fact that there was more than $500,000 in the hands of the executors at the time the decree was made January 14, 1937, available for the creation of the four trusts. One might concede that if the surrogate, when he made the instant decree, was confined to the foregoing facts, it might well be that the presumption in favor of the validity of the decree of January 14, 1937, was overcome.

However, assuming, as one must, that the surrogate before making the decree of January 14, 1937, investigated, and determined after such investigation, that the decree was within his power to make, it then becomes essential to examine this present record to determine what such an investigation would have disclosed. Those circumstances will be next discussed.

At the outset it is apparent that the use of the word "reduction" was unfortunate because as hereinafter shown, there was no reduction of this trust. Indeed, there was no thwarting of testator's intention to set up a trust of $500,000 for his widow. Scant as this record is — it does not even show the inventory and accounts — it seems fairly adequate to establish a basis for that decree. Applicable to this particular consideration is paragraph tenth of the will which authorized the trustee to receive, in erecting any trust created by the will, securities which were on hand at the time of testator's death. As already noted, decedent's personal estate at the time of his death, March 3, 1930, was better than $1,800,000. The total amount required for the payment of debts, death taxes, legacies, and the erection of the three small trusts aggregating $130,000 was approximately $360,000, or $310,000, if the third debit item of $46,915.55 be deemed to be an offsetting credit of a like amount included in the total of the credit of $104,772.73. It seems fairly inferable from this record that the foregoing things were done very soon after the testator's death. There then remained in the hands of the executors applicable to the erection of the four trusts authorized by the seventh and eighth paragraphs of the will, which, as far as this record shows, was all that remained to be done, approximately from $1,400,000 to $1,500,000. Of this again it is fair to assume the greater part consisted of securities, all of which, if the trustee so elected, could have been utilized in the erection of any or all of these trusts. Concededly, since there was no apparent obstacle which would

have prevented their erection, they should have been set up promptly and certainly within one year of the issuance of letters testamentary. Had the trustee so proceeded, the trust for Mrs. Wade could have been created by taking into it such securities as her husband had on hand at the time of his death. Mrs. Wade was a coexecutor and so had equal control of those securities. She could have compelled an accounting and the erection of her trust. Instead, however, of allocating the securities on hand to the various trusts, evidently they were pooled. Even as scantily disclosed by the present record, the surrogate was justified in finding that the widow had consented to this breach of trust, if actually she did not participate in it. Her position in that respect comes perilously close to *Woodbridge* v. *Bockes* (170 N. Y. 596). Even the beneficiary of a spendthrift trust is precluded, by his consent to an act constituting a breach of trust, from holding the trustee liable. (2 Scott on Trusts, § 216.1.) He was further justified in finding that this situation prevailed until the trusts were actually set up by the decree of January 14, 1937. During this entire period she and her coexecutor received income from these securities available for the creation of the trusts. And again, as already noted, it is inferable even from this record and undoubtedly was more clearly shown by the account of the executors which the surrogate then had before him, that this same income was disbursed to her and the three other *cestuis*. It must be assumed that these accounts were properly prepared and disclosed the details of the fiduciaries' acts. Except then, for a specific allocation of securities to each trust, the surrogate could have determined that there had been a practical performance by the trustee of its duty. Even this record shows that this estate suffered losses in the course of the administration from April 7, 1930, to January 5, 1937, which with depreciation in the value of securities from their value at the time of the testator's death amounted to nearly $675,000. The problem which was then presented to the surrogate on January 14, 1937, was on whom was this loss to fall. Confronted as the surrogate was with the withdrawal of all claims of misconduct by the executors in the handling of the estate, he could reach no other logical conclusion than that the decrease in the value of the estate from the spring of 1931 when the trusts should certainly have been erected was due to the general decline in security values which began in October, 1929, and continued well into 1933. Finding, as he would have been required to find, that Mrs. Wade who as executor had possession of this estate the same as her coexecu-

tor, must have consented to the pooling of the trusts because she and her coexecutor received and disbursed the income therefrom, it would have been highly inequitable to have saddled upon the children the entire diminution of the pool. To have done so would have permitted her, at the expense of her own children, to have profited as the result of a fiduciary breach to which she at least could have been found to have consented, even if she was not an actual participant in the wrong. The surrogate in that situation could then have applied the maxim of equity, that that which ought to have been done must be deemed to have been done and to have determined that had Mrs. Wade's trust been set up for her at the time it should have been set up, and had the trustee, in allocating securities to the four trusts, exercised fairly its discretion to put into each trust such securities as the testator had on hand at the time of his death, any trust created for Mrs. Wade within a year after his death out of the securities which were then on hand would not have had a value exceeding $400,000 on January 14, 1937. When, therefore, the surrogate following the terms of the compromise agreement made a decree directing that a trust be set up consisting of legal investments, much safer and better in character than the *cestui* would have had if the trust had been set up when it should have been, he was not reducing the trust but was actually allocating to it a better class of securities than the *cestui* was originally entitled to have placed in the trust and securities which certainly equaled, on January 14, 1937, if they did not substantially exceed in value, what would have been the value of the securities in the trust had it been erected when it should have been.

Taking the foregoing view of the situation as it was presented to the Surrogate on January 14, 1937, the mere fact that the agreement and decree itself provided for a reduction of the trust from $500,000 to $400,000 did not require a finding in *this* proceeding that that was what was actually done. Since most of the circumstances appear at least by fair inference from this present record and since the other circumstances not disclosed by this record were disclosed by the inventory and the accounts of the surrogate at that time of the making of both decrees, the determination of the surrogate by his decree herein disallowing the first two objections, that the allocation of securities for Mrs. Wade's trust, having a market value on January 14, 1937, of $400,000, by a decree of that date, did not reduce the trust but was actually a compliance with paragraph seven of the will, was fully authorized, thus preventing a sur-

charge, in the instant proceeding, of this trustee in the sum of $100,000, with interest thereon. While it is undoubtedly true that this record is scanty, and that it would have been more satisfactory if the basic facts upon which the foregoing conclusion is reached were more fully shown, still one cannot escape the conclusion from a reading of this record that this widow drove a hard bargain and really obtained for herself a trust with a better class of securities than she was entitled to have, and with a value that exceeded the value of what would have been the value of her trust had it been fairly set up out of her husband's securities when it should have been erected.

Nor is there merit in the claim that the portion of the decree of January 14, 1937, allocating the specific securities to this trust, as a complete performance of the duty of the trustee under paragraph seven of the will, was outside the scope of the proceeding then before the surrogate. This was the final accounting of the executors. All interested parties were before the court. Directions to the executors were necessary as to what disposition they were to make of the assets then on hand. The trustee was ready to set up these trusts separately. The decree so providing was a necessary incident to the one settling the account.

The third and fourth objections to the account relate (a) to certain railroad bonds claimed to be nonlegal investments for trustees, which were received into the trust at the time it was erected January 14, 1937, and (b) to a few other railroad bonds purchased after January 14, 1937, which in turn were claimed not to be legal investments. As at the time the objections were filed, some of these bonds placed in the trust originally had been sold or exchanged, and the remainder were still in it; there had been losses on the sales and the values of others had declined from their value at the time they were placed in the trust. The bonds acquired after January 14, 1937, were worth less at the time the objections were filed than when purchased. The objectants, therefore, insisted that not only was there a breach of fiduciary duty in taking into the trust bonds which were not legal for investments by trustees and in acquiring similar bonds thereafter, but also that the trustee was negligent in retaining these bonds, and should be surcharged for the actual and potential losses.

To determine the validity of these objections, it is necessary to consider section 111 of the Decedent Estate Law and section 21 of the Personal Property Law, subdivisions 7 and 7-a of section 235, formerly section 239, of the Banking Law, and

section 35 of the latter statute. The sections of the Decedent Estate Law and the Personal Property Law authorize a trustee to invest in the same *kind* of securities as those in which savings banks of this State may invest the money deposited therein. Subdivision 7 of section 235 of the Banking Law authorizes the investment by a savings bank in railroad obligations as provided in that subdivision. The bonds of such a corporation, which do not have income available for fixed charges at least one and one-half times the fixed charges in each year for at least five of the fiscal years, including the one next preceding the investment, are made ineligible. In addition the same subdivision limits the investments in railroad obligations to 25% of the bank's assets and not more than 10% in the bonds of any one domestic railroad corporation, nor more than 5% in the obligations of a foreign railroad. Subdivision 7-a of this section was added by chapter 5 of the Laws of 1932 and substantially re-enacted in each year thereafter to and including 1937, the year involved in these objections. As originally enacted in 1932, this subdivision provided that whenever in subdivision 7 of the section a number of fiscal years was mentioned, the fiscal year beginning in the year 1931 should be excluded from the count if the inclusion of such year would render the security of any railroad ineligible for investment, and all railroad securities which were eligible for investment by savings banks on January 1, 1931, or had become eligible since that date, or prior to 1933 became eligible, should continue to be eligible for such investment until April 1, 1933. As originally enacted, it provided that the securities of a railroad company which defaulted during the year 1931 or prior to April 1, 1933, in the payment of matured principal or interest of any of its funded indebtedness should not be eligible for such investment. In each year thereafter, including the year 1937, the statute was amended, to accomplish what seems clear to have been intended by these amendments, namely, to make eligible for investments, by savings banks, obligations of railroad corporations provided that they had not defaulted in the payment of matured principal or interest of any of its funded indebtedness, despite the fact that they failed in the years set forth in the original statute and in the amendatory ones, to have income equal to one and one-half times their fixed charges.

Section 35 of the Banking Law obligates the Superintendent of Banks to mail to each savings bank on or before July 1st in each year as complete a list as is practicable of bonds and obligations of railroads which in his judgment, if legally issued

and properly executed, conform to the provisions of section 235 of the Banking Law.

Insofar as the investments herein questioned by appellants' objections are concerned, all of them were on the superintendent's lists when they were originally taken into the trust on January 14, 1937, or acquired in that year. Concededly, also, no one of them was ineligible because of a default in the payment of matured principal, or interest on any of its funded indebtedness. The question of the legality of the investments therefore centers, primarily, around the meaning of subdivision 7-a of section 235 of the Banking Law.

It is the position of the appellants that subdivision 7-a was never intended to do more than to authorize a fiduciary who prior to enactment of subdivision 7-a held railroad obligations which were legal investments on January 1, 1931, to retain such investments even though the railroads which had issued them failed to earn applicable income equal to one and one-half times their fixed charges, but that the subdivision was never intended to authorize new investments thereafter in such obligations. Their argument is that the statute was a mere retention statute designed to tide over, during the depression years, savings banks which had made investments in such securities prior to January 1, 1931. A reading of the statute fails to show such a restricted meaning. The language used does not warrant that construction. Any such meaning must be read into it. The language seems to be clear that the obligations of railroads, even though they fail to earn the income required by subdivision 7 of section 235, available for fixed charges, still continue to be eligible for investment. Therefore, assuming that the superintendent's list was not a conclusive answer to the objections, since under the foregoing construction of subdivision 7-a, all of the bonds which were taken into the trust or purchased in 1937 by the fiduciary, were legal investments for savings banks and so for fiduciaries, the objections on the score that by taking or acquiring the questioned bonds there was a breach of fiduciary duty is not tenable.

Nor does there seem to be merit in the further claim of the petitioners that if the applicable provisions of the Decedent Estate Law and Personal Property Law mean what they say and that investments in the same kind of securities in which savings banks are permitted to invest authorized this trustee to take into the trust, and to acquire the bonds which it did as legal investments, the other provisions of subdivision 7 limiting the amount of such bonds which may be acquired by a savings

bank to a percentage of its assets, applies also to a fiduciary. It may be conceded that, if the percentage of investments in railroad securities applicable to savings banks applies also to fiduciaries, this trustee, as to certain railroad bonds, held unlawful percentages measured by the total value of the trust. Again, such a construction is not warranted by the language of the two statutes giving permission to fiduciaries to invest in the same kind of bonds in which savings banks may invest. The language of the two sections of the Personal Property Law and the Decedent Estate Law, already noted, simply limit the investments to the same *kind* of securities in which savings banks may invest. Those two sections contain no limitation as to what percentage of the trust fund may be invested in such obligation. Therefore, since all of the bonds involved in these objections must be held to have been of the kind in which savings banks could invest, the objections on that score are not sound.

Lastly, it seems clear from a reading of the record that in the management of the trust after it was erected on January 14, 1937, this trustee acted with prudence in handling it, and in making investments. Consequently there is no basis for a finding of negligence on its part in respect to these investments. Appellants failed to sustain their claim of lack of prudence or negligence in the handling of the trust.

Insofar as this appeal seeks to review the allowances made to the referee and special guardian, while they were generous, it cannot be said that they were excessive. The allowance to the referee was authorized by section 284 of the Surrogate's Court Act, which entitles a referee in Surrogate's Court to the same fees as allowed to a referee in the Supreme Court. A Supreme Court referee is entitled to $25 per day unless a different rate is fixed by the court, or a judge or justice thereof, or by consent of the parties manifested by an entry in the minutes of the referee, or otherwise in writing. (Civ. Prac. Act, § 1545.) Since the requirement of the section is that the consent of the parties must be manifested in the minutes of the referee or be in writing, it cannot be deemed to be applicable to a fixing of compensation by a court, or a judge or justice thereof. It would follow that the surrogate, in fixing the fees of the referee, was not limited to compensation at $25 per day.

For the foregoing reasons the surrogate's decree should be affirmed, with costs to the respondent payable out of the corpus of the estate.

All concur, HARRIS, J., joining in the opinion, and with the following added memorandum: From this record I gather that the surrogate correctly construed the will so as to establish as matter of law that the wife and the three children, insofar as their trusts were concerned, were to share on a parity in the estate. Present — TAYLOR, P. J., DOWLING, HARRIS, LARKIN and LOVE, JJ.

Decree affirmed, with costs to the respondent payable out of the corpus of the estate. [See *post,* p. 982.]